United States District Court
Northern District of Indiana
Hammond Division

| KEVIN D. MILLER and | ) | |
| JAMILA D. MILLER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 2:09-CV-205 JVB |
| | ) | |
| CITY OF PLYMOUTH, MARSHALL | ) | |
| CNTY. SHERIFF'S DEP'T, JOHN | ) | |
| WEIR, individually and in his official | ) | |
| capacity as an employee or agent of the | ) | |
| City of Plymouth and/or the Plymouth | ) | |
| Police Department, NICHOLAS | ) | |
| LAFFON, individually and in his | ) | |
| official capacity as an employee or | ) | |
| agent of Marshall County and/or the | ) | |
| Marshall County Sheriff's Department | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Pursuant to Federal Rule of Civil Procedure 72(a), Plaintiffs Kevin and Jamila Miller object to Magistrate Judge Cherry's order ruling that Defendants did not destroy video evidence thereby warranting sanctions. For the following reasons, Magistrate Judge Cherry's order is affirmed.

**A. Facts**

On May 18, 2008, the Millers, who are African Americans, were driving in their car from Gary, Indiana, to Fort Wayne, Indiana, on U.S. 30. (Compl. ¶10.) At 11:45 p.m. the Millers were stopped at a traffic light at the intersection of U.S. 30 and Oak Road in Plymouth, Indiana. (*Id.* ¶11.) Defendant Officer Weir of the Plymouth Police Department was parked on the shoulder of the intersection in a marked squad car facing eastbound on U.S. 30. (*Id.* ¶12.) His car was located

on the same side of the intersection as the Millers. (*Id.*) Officer Weir is a canine officer and had his dog in the car. (*Id.*)

While the Millers were at the intersection, Marshall County Sheriff Deputy Laffoon pulled up behind the Millers in a marked squad car. (*Id.* ¶13.) Mr. Miller had seen through his rearview mirror that Deputy Laffoon had turned onto the eastbound lane of U.S. 30 less than a mile from the intersection. (*Id.*) Deputy Laffoon activated his emergency lights, and the Millers pulled their car onto the shoulder of U.S. 30 and turned off the engine. (*Id.* ¶15.) Laffoon and Weir got out of their cars and approached the Millers. (*Id.* ¶16.)

During the stop, Weir walked his police dog around the Millers' car. (*Id.* ¶20.) Weir approached the driver's door with the dog tethered on a leash and ordered Mr. Miller from the car. (*Id.*) Mr. Miller got out but was apprehensive of the dog. (*Id.* at ¶21.) Officer Weir permitted the dog to approach and sniff Mr. Miller which "sandwiched" Mr. Miller between the dog and his vehicle. (*Id.*) As Mr. Miller attempted to shield himself from the dog, Weir instructed him not to move because the dog "will bite your ass." (*Id.*) Mr. Miller was then instructed to stand about ten feet behind his car. (*Id.* ¶23.)

Weir opened the front driver's side door of the Millers' vehicle and prompted the dog to enter. (*Id.*) Mrs. Miller, still in the vehicle's front passenger's seat, was very afraid of the dog. (*Id.*) Both of the Millers repeatedly objected to the search and Weir's use of his dog. (*Id.* ¶24.) When Weir did not cease, Mr. Miller objected to Laffoon. (*Id.* ¶26.) At that point, Weir approached Mr. Miller from behind and handcuffed him. (*Id.*) Mr. Miller asked if he was under arrest, and Weir responded that he was being "detained." (*Id.*)

About forty to forty-five minutes after the traffic stop had been initiated, and after the search of the Millers' vehicle produced no illegal drugs, weapons, or contraband, Weir approached Mr.

Miller and searched through his pants pockets. (*Id*. ¶33.) No illegal drugs, weapons, or other contraband were found on Mr. Miller. (*Id*. ¶34.) Eventually, the Millers were released from their detention and permitted to proceed on their trip.

Plaintiffs served Defendants with their Indiana Tort Claim Notices on October 15, 2008. (DE 294 at 2.) Plaintiffs subsequently filed this action on July 22, 2009. (*Id*.) On April 29, 2010, the Court ordered Defendants to produce any reports and audio or video recordings in their possession detailing incidents where Weir ordered his dog to sniff a detained vehicle since January 1, 2004. (DE 127 at 22, 35.)

At a hearing held on December 16, 2010—conducted to resolve Plaintiffs' motion for sanctions for spoliation (DE 241), Judge Cherry heard testimony from Plymouth police chief James Cox, Assistant Chief of Police David Bacon, and Officer Weir. (DE 294 at 2.) The witness testimony revealed that the only video recording policy the Plymouth Police Department officially have dates back to 1993, when VHS cassettes were still used. (*Id*.) The policy dictated that officers were to retain recordings for a minimum of seven days; after that, the cassettes could be reused. (DE 313 at 22.) If an officer believed the tape would be useful "in the judicial process," the officer could choose to save the video. (*Id*.)

In 2006, the Plymouth Police Department purchased three digital recording systems to replace the archaic VHS devices. (*Id*. at 25.) Testimony at the hearing revealed these recording devices frequently malfunctioned. (*Id*. at 25–26, 46–51.) On the night of the Millers' stop, Officer Weir's car had the only working video recorder in the department. (DE 294 at 3.) Officer Weir did preserve a DVD copy of the Millers' traffic stop. (DE 313 at 43.)

The digital recording system in Officer Weir's car was continuously recording onto an embedded hard drive. (*Id*. at 42.) The system automatically burned video footage onto a DVD

every time Officer Weir turned on his police lights. (*Id.*) When the DVD was full, the system asked the user if she wished to save the entries made on the DVD or reformat the disk, erasing the content but allowing the inserted DVD to be reused. (*Id.*) The recording system's hard drive could store approximately thirty days of traffic stop recordings; the DVD, however, could be filled up in a single shift. (DE 294 at 3.)

Officer Weir testified that the county prosecutor approached him in early 2010 to request he start saving video copies of certain types of arrests or traffic stops. (DE 313 at 50–51.) The prosecutor also purchased Officer Weir the DVDs he would need to complete the task. (*Id.*) Shortly thereafter, however, Officer Weir's camera malfunctioned. (*Id.*) From that point, Officer Weir's camera only worked "[o]ff and on." (*Id.* at 54.) In October 2010, the Department installed a new video system in Officer Weir's vehicle. (*Id.*) Officer Weir testified that he does not have any video recordings dating back to January 1, 2004. (*Id.* at 56.) Police Chief James Cox and Assistant Chief of Police David Bacon also stated that the department does not have video recordings dating back to early 2004, nor does it have a "library" where it stores video footage. (*Id.* at 22–23, 28, 35, 47–49.)

**B. Legal Standard for Rule 72(a)**

Under Rule 72(a), a district judge may modify or set aside any part of a Magistrate's order that is clearly erroneous or is contrary to law. Fed. R. Civ. P. 72(a). "The clear error standard means that the district court can overturn the magistrate judge's ruling only if the district court is left with the definite and firm conviction that a mistake has been made." *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 943 (7th Cir. 1997). This is a highly deferential standard of review; the district court may not reverse the magistrate judge's decision simply because it

4

would have arrived at a different conclusion. *See Pinkston v. Madry*, 440 F.3d 879, 888 (7th Cir. 2006).

**C. Discussion**

**(1)** *Rule 37(e)*

When presented with a motion for sanctions, many courts have evaluated the following factors: (1) was there a duty to preserve documents; (2) was the duty to preserve breached; (3) does the culpability for the breach rise to the level of willfulness, bad faith, or fault; (4) did the party seeking production suffer prejudice as a result of the breach; and (5) can an appropriate sanction ameliorate the prejudice from the breach. *Bryden v. Boys and Girls Club of Rockford*, No. 09 C 50290, 2011 WL 843907, at *1 (N.D. Ill. Mar. 8, 2011) (citation omitted). An award of sanctions "must be proportionate to the circumstances surrounding the failure to comply with discovery." *Crown Life Ins. Co. v. Craig*, 995 F.2d 1376, 1382 (7th Cir. 1993). Absent "exceptional circumstances," however, the Federal Rules of Civil Procedure caution a court not to impose sanctions on a party who lost electronically stored information because of the routine, good-faith operation of an electronic information system. Fed. R. Civ. P. 37(e).

**(2)** *Plaintiffs' Arguments*

Plaintiffs contend that Judge Cherry's order is clearly erroneous "because the recording device in this case did not *automatically* record over previously stored videos. Rather, the hard drive was knowingly and willfully 'reformatted' . . . at the prompting of the equipment operator." (DE 302 at 1.) Plaintiffs thus argue that Defendants cannot use Rule 37(e)'s safe harbor because the choice not to burn relevant video footage to DVD was a policy, practice, or

5

custom of the Defendants, not a routine operation of an electronic information system. (*Id*. at 6.)[1]

Plaintiffs also cite *Wiginton v. Ellis* to support their position that Defendant's conduct shows bad faith. (*Id*. at 5–7.)

*Wiginton* was a sexual harassment case that escalated to a motion for sanctions for spoliation of evidence. *See Wiginton v. Ellis*, No. 02 C 6832, 2003 WL 22439865, at *4 (N.D. Ill. Oct. 27, 2003). The court determined that the defendant acted in bad faith for several reasons. First, the defendant only sent one email to its employees informing them that they needed to retain documents relating only to the plaintiff. (*Id*. at *5.) The court noted that this directive "lacked the appropriate scope," as it allowed email evidence concerning plaintiff's harassing supervisors to be destroyed. (*Id*.) Next, the court emphasized that the plaintiff's discrimination charge had already been filed with, and investigated by, the Illinois Department of Human Rights. (*Id*.) This preliminary investigation, at a minimum, should have put defendants on notice that the destroyed emails were relevant to the plaintiff's impending lawsuit. (*Id*.)

Plaintiffs heavily rely on the following passage:

> [O]nce a party is on notice that specific relevant documents are scheduled to be destroyed according to a routine document retention policy, and the party does not act to prevent that destruction, at some point it has crossed the line between negligence and bad faith. At that point, we must find that the reason for the destruction becomes because the party knew that relevant evidence was contained in the documents and wanted to hide the adverse information, rather than because the documents were scheduled to be destroyed. In this case, the facts surrounding the destruction of the documents are evidence that [the defendant] knew that it had a duty to preserve relevant documents. Its failure to change its normal document retention policy, knowing that relevant documents would be destroyed if it did not act to preserve these documents, is evidence of bad faith.

---

[1] The 2006 official comments to Rule 37(e)—then Rule 37(f)—explain that the routine operation of computer systems "includes the alteration and overwriting of information, often without the operator's specific direction or awareness . . . . Such features are essential to the operation of electronic information systems." Here, it was essential to the operation of Defendants' cameras that the user either save the recordings on the DVD or rewrite the information on it. Critically, by noting that routine operations "often" occur without the operator's specific direction, the drafters acknowledge that "routine operations" can still occur despite the direct involvement of a system user. Accordingly, Plaintiffs' contention that the activity of the camera user—which was extremely minimal in this case—takes the electronic information outside of Rule 37(e)'s safe harbor construes Rule 37(e) too narrowly.

*Id*. at *7. This quote, however, reveals why *Wiginton* is distinguishable from Plaintiffs' situation. First, it was undisputed that the *Wiginton* defendant had relevant evidence regarding plaintiff's sexual harassment suit in its possession. This was not the case for the Plymouth Police Department, however. The Defendants kept no "video library" of past police stops, and its policy since the early 1990s has been to record over old footage—except when an individual officer exercised her discretion to preserve the footage. (DE 294 at 6.) Thus, pursuant to departmental policy, the Defendants recorded over some of the desired footage long before Plaintiffs' stop on May 18, 2008. Unlike the *Wiginton* defendants who had relevant evidence—but knowingly remained idle as it was destroyed through normal procedures—Defendants did not utilize their video policy to justify erasing footage already in its possession.

Plaintiffs' next argument involves their November 3, 2009, letter requesting any video evidence the department had of Officer Weir and his canine. (DE 302 at 2.) Plaintiffs assert that Defendants had an obligation to amend their video storage policy after receiving notice of their discovery request, and Defendant's failure to do so amounts to bad faith. (*Id*. at 6.) Plaintiffs' argument assumes relevant video footage ever existed and overlooks the significant trouble Defendants have experienced in operating and maintaining their digital systems. (DE 313 at 25–26, 30, 46–51.) For instance, from spring 2010 to October 2010 Officer Weir did not have a reliable camera system in his vehicle. (*Id*. at 54.) Even now, the Defendants' brand new digital recorders are problematic. (*Id*. at 46.) Lastly, Officer Weir indicated that the county prosecutor asked him to make DVD copies of certain traffic stops "towards the beginning of [2010]," but because of his broken camera system, he could not comply with the request. (*Id*. at 50–54.) This request suggests an effort to comply with Plaintiffs' discovery demands, not an effort to conceal adverse information.

Judge Cherry noted that the Defendants had no control over the fact that the system's hard drive would record over old data every thirty days. (DE 294 at 6.) There was also no evidence the Defendants destroyed any DVD copies made from the recorder's hard drive. (*Id*.) Consequently, after holding a hearing and thoroughly evaluating the facts before him, Judge Cherry ruled that the Defendants have not acted in bad faith. (*Id*.) The Court cannot conclude that this finding was clearly erroneous.

**D. Conclusion**

The Court AFFIRMS Magistrate Judge Cherry's order denying sanctions (DE 294). Therefore, the Court DENIES Plaintiffs' Rule 72(a) motion for review (DE 302).

SO ORDERED on April 15, 2011.

    S/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE